IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| RACHEL CARTWRIGHT, | * | Chapter 13 |
| Debtor | * | |
| | * | |
| KONSTANTINOS KARANIKAS, | * | Case No.: 1-13-bk-03952MDF |
| Movant/Objectant | * | (Motion to Dismiss Case) |
| | * | (Objection to Plan) |
| v. | * | |
| | * | |
| RACHEL CARTWRIGHT, | * | |
| Respondent | * | |

## OPINION

Before the Court is the motion of Konstantinos Karanikas ("Karanikas") to dismiss the Chapter 13 case filed by his ex-wife, Rachel Cartwright ("Debtor"). Alternatively, Karanikas has objected to the confirmation of Debtor's Chapter 13 plan as not having been filed in good faith. Debtor's petition lists Karanikas as holding an unsecured, non-priority claim of $75,000. For the reasons discussed below, the motion to dismiss will be denied. The objection to confirmation will not be ruled upon as Debtor intends to file an amended plan.

### I. Procedural and Factual History

Debtor filed her Chapter 13 petition and plan of debt adjustment on July 31, 2013. Debtor proposes to fund the plan with payments of $375 per month for thirty-six months[1] for a total base plan of $13,500. At the time of the hearing, Debtor was not employed and was enrolled in school full time as a nursing student. The plan proposes to pay the Trustee's fees, the attorney's fees of Debtor's bankruptcy counsel, and the priority tax claim of the Internal

---

[1]Debtor's monthly income of $2900 is below the median income for Pennsylvania residents. Thus, the applicable commitment period for Debtor's plan is thirty-six months. 11 U.S.C. §§ 1322(d)(2), 1325(b)(1)(B).

Revenue Service (the "IRS"). Debtor lists only a few unsecured claims in connection with her petition – several student loans, a modest claim for utility service, two medical bills, one retail charge of $49, and attorney's fees for non-bankruptcy services of $11,000. Karanikas holds the largest unsecured claim, and this class will receive no payment under Debtor's proposed plan.[2]

The dispute in this matter arises from the parties' marital settlement agreement and their ongoing acrimonious relationship since their divorce, including disputes over maintenance of the former marital home and custody of their daughter.[3] On or about June 1, 2006, Debtor and Karanikas entered into a Voluntary Separation and Property Settlement Agreement (the "Marital Agreement") in connection with the parties' divorce. On October 6, 2008, the Circuit Court for Anne Arundel County, Maryland entered a Consent Order and Judgment for Divorce (the "Divorce Order"). Under the terms of the Divorce Order, Debtor had the exclusive use and possession of the former marital home ("the Property") located in Severna Park, Maryland until October 2012. The Divorce Order provided that "during the four years that [Debtor] has sole use and possession of the family home, she shall be responsible for the cost of the routine maintenance and upkeep of the family home. Any major repair, defined as any single repair exceeding $1000.00 in costs, shall be shared equally by the parties. No major repair expense can

---

[2] A total of eight proofs of claims were filed in Debtor's case, and the bar date has passed for the filing of both non-governmental and governmental claims. The IRS filed a claim of $9505.98 with $7491.70 of that amount classified as priority and the remaining $2014.28 classified as non-priority, unsecured. Several creditors filed non-dischargeable claims for student loans – Wells Fargo ($5075.65), Education Credit Management ($3573.71), BELnet on behalf of the U.S. Department of Education ($45,011.12), and PHEAA ($2517.59). General unsecured claims were filed for RJM Acquisitions Funding, LLC ($136.30), Quantum3 Group LLC as agent for Galaxy Asset Purchasing LLC ($1269.33) and Karanikas ($75,000).

[3] Karanikas asserted that Debtor had threatened to damage the former marital home and had threatened Karanikas' current wife. Debtor denied she made either threat, but she conceded that a "peace order" was entered against her by a Maryland court.

be incurred unless both parties agree; . . ." Movant's Ex. 5. Debtor and the parties' two children resided at the Property until June 2012, when Debtor decided to relocate to Pennsylvania.

Debtor admits that she was responsible for the routine maintenance and upkeep of the Property until she vacated the premises. She testified that in August 2011 she discovered that water was leaking through the ceiling in her daughter's room. She speculated that the roof had been damaged when Hurricane Irene moved through the area earlier the same month. After discovering the problem, she contacted Karanikas to inform him of the situation. She also requested that he provide her with information on homeowners' insurance covering the Property. Karanikas asked her to locate the leak in the attic and put a bucket under it until the roof could be repaired. She testified that she attempted to locate the leak, but was unable to do so. She took no further action to remedy the problem until approximately one month later, when she consulted the husband of a friend, who she believed had experience in construction, about the problem. Debtor stated that her friend's husband determined the source of the leak and advised her to apply spackling to a small hole in the ceiling where the water was entering her daughter's bedroom. She testified that she followed his advice and, noticing that the carpet beneath the hole had dried, considered the problem to be fixed.[4] Although both Debtor and Karanikas were aware of the roof leak in August 2011, neither party took further action to have the roof repaired for approximately nine months.

In May 2012, Karanikas sent an email to Debtor demanding that Debtor's parents vacate the premises and that she arrange for certain repairs to be made to Property. Specifically,

---

[4]I do not understand how someone who reputedly had experience in construction would recommend correcting a roof leak by patching a ceiling. Whether Debtor decided to remedy the problem by patching the ceiling based on the advice of someone else, or adopted this approach on her own, the measures she took clearly were inadequate to address the problem.

3

Karanikas asked Debtor to have a Maryland certified home improvement contractor approved by him repair the front steps, power wash the exterior, repair the hole in the roof, correct the interior mold problem, repaint the interior, and repair the surround sound wiring.[5] At the same time, Karanikas informed Debtor he intended to file suit against her "for damages incurred by your neglect to the property [stating that he would] be asking for an award of rent monies from the other people that have stated on public records that their address is 581 Manor Road in Severna Park, MD 21146." Respondent's Ex. 3.

Rather than arranging for a home improvement contractor to submit estimates for the repairs, Debtor sent an email to Karanikas June 14, 2013 informing him that she was moving to Hummelstown, Pennsylvania. On July 10, 2013 she sent an email to Karanikas informing him that she would be terminating the utilities on July 12 and requesting that he arrange to have the utilities transferred into his name. In her testimony, Debtor stated that she was in the house on July 13 and the electricity was still on. On July 10, Karanikas responded that "[g]iven you are abandoning the home I am going to attend there on Friday [July 13] and periodically thereafter and ensure it is wind and water tight and secure it to protect the mortgagee." Respondent's Ex. 3.

On July 13, Karanikas inspected the Property. Debtor previously had sent an email to her former husband stating that the keys and the garage door opener were in the kitchen. She also provided him with the garage code to enter the house. When Karanikas arrived, however, he was unable to enter the home because there was no electricity to power the garage door. After he obtained the services of a locksmith, he entered the home. Karanikas testified that the smell of cat urine was overwhelming when he opened the front door. He discovered stains on the marble

---

[5]It is unclear from the record how Karanikas determined that the repairs, other than the roof leak, needed to be made.

4

flooring in the home office area, which he determined were attributable to cat urine. He testified that when he entered the bedrooms he found "garbage" on the floor of his son's room and his daughter's room smelled of mold. Upon further inspection, Karanikas testified that he found mold under an area of carpet in his daughter's room where water had accumulated from the roof leak and that the baseboard trim around the area was soft and rotted. When he pulled up the damp carpet, he stated he found "maggots" underneath. Karanikas also provided testimony and photographic evidence that the wiring for the entertainment system speakers had been intentionally cut.[6] He asserted that certain kitchen appliances were not working and that a "foul odor [was] coming out of them." Hrg. Tr. at 32.

According to Karanikas, the exterior of the Property was in poor condition. He stated that garbage bags were ripped open in the yard; their contents strewn across the lawn. He described algae and mold growing on the HVAC unit. The "integrated shed" to the house was "filthy" and a siding board was detached. Hrg. Tr. at 28. He said the lawn was covered with weeds and unraked leaves and that a dry stone wall was in disrepair. Karanikas testified and introduced evidence showing that he incurred expenses of approximately $34,000 to rehabilitate the Property, including extensive mold remediation, before it was listed for sale. He also paid approximately $2400 for temporary "staging" of the interior with appropriate furnishings and decorations to make the Property more attractive to potential purchasers.

Photographs introduced by Karanikas showed mold growth beneath a relatively narrow length of carpet along a wall in his daughter's bedroom. The water damage in this area caused a foot or two of wood molding in the area to rot. Karanikas' photographs documented that there

---

[6]Debtor did not deny that the wires to the speakers had been cut. She testified that the parties' son damaged the equipment intentionally because he was angry with his father.

was water damage in the ceiling above the rotted wood molding. Debtor did not dispute that the damage to the carpet and baseboard, as well as the resultant mold, was attributable to the roof leak.

Debtor introduced photographs taken of the home the day she vacated the Property. Although the photographs she selected appear to show clean, undamaged floors, walls, and appliances, carpets and molding were not pulled back, which would have revealed the mold beneath the surface. Nevertheless, the photographs and the receipt from the carpet cleaner supported Debtor's assertion that the house had been cleaned around the time she vacated the Property. Photographs of the home exterior document that a section of a dry stone wall had been dismantled and restacked in a haphazard manner and that there was algae/mildew growing on the siding. In general, however, the Property appeared to be in fair condition when Debtor left the home, although the unrepaired roof continued to be an unseen source for future damage to the interior.

In February 2013, Karanikas filed a complaint against Debtor in Maryland state court alleging Debtor had committed permissive and voluntary waste in connection with the Property (the "Maryland Litigation"). Debtor filed an answer to the complaint and discovery was commenced. Before the matter came to trial, Debtor's litigation counsel informed her that the cost to defend the suit would be between $25,000 and $35,000. Having determined that she could not afford to defend the suit, Debtor filed the instant Chapter 13 bankruptcy case on July 31, 2013.

At some point in 2013, the Property was sold. Under the Marital Agreement, Debtor was to receive up to $75,000 from the sale proceeds. After settlement, Debtor received only approximately $1100.

The hearing on both the motion to dismiss and the objection to confirmation of the Debtor's plan was held on February 6, 2014. Both parties have filed briefs, and the motion to dismiss is ripe for decision.[7]

## II. Discussion

If Debtor's petition merits dismissal, then objections to the confirmation of any Chapter 13 plan are moot. Therefore, I will address the motion to dismiss first.

*A. Requirement that a Chapter 13 petition be filed in good faith*

On request of a party in interest, a Chapter 13 bankruptcy case may be dismissed "for cause." 11 U.S.C. §1307(c). In the case before me, Karanikas alleges that Debtor filed for bankruptcy for the sole purpose of thwarting his effort to obtain a judgment in state court and for no legitimate purpose. Therefore, Karanikas asserts, Debtor's case was not filed in good faith. Although good faith is not explicitly mentioned in the Code, both the Supreme Court and the Court of Appeals for the Third Circuit have recognized the absence of good faith or presence of bad faith as grounds for dismissal. *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 373-74 (2007); *In re Lilley,* 91 F.3d 491, 496 (3d Cir. 1996). *See also Hamm v. Manfredi (In re Manfredi),* 434 B.R. 356, 358-59 (Bankr. M.D. Pa. 2010) (citing *Lilley* for the proposition that additional factors, such as lack of good faith, constitute cause for dismissal of a Chapter 13 case).

The Court of Appeals observed in *Lilley* that "'good faith is a term incapable of precise definition.'" *Lilley*, 91 F.3d at 496 (quoting *In re Love*, 957 F.2d 1350, 1355 (7th Cir. 1992)).

---

[7]I have jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A) and (O). This Opinion and Order constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

7

Because assessing good faith is a fact intensive endeavor, this determination should be left to the sound discretion of the bankruptcy court after considering the totality of the circumstances. *Id.* Under *Lilley*, the "totality of the circumstances" test comprises the following nonexclusive list of factors:

> (1) the nature of the debt;
> (2) the timing of the petition;
> (3) how the debt arose;
> (4) the debtor's motive in filing the petition;
> (5) how the debtor's actions affected creditors;
> (6) the debtor's treatment of creditors both before and after the petition was filed; and
> (7) whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Id., quoted in In re Myers,* 491 F.3d 120, 125 (3d Cir. 2007). These factors serve as a guide to the court and should be applied flexibly to the facts submitted in evidence when analyzing whether the filing is "fundamentally fair" to creditors. *Love*, 957 F.2d at 1357; *see also New Jersey Lawyers' Fund for Client Protection v. Goddard* (*In re Goddard*), 212 B.R. 233, 239 (D. N.J. 1997).

The initial burden is on the objecting creditor to produce evidence challenging a debtor's good faith. If the creditor meets his burden, the burden then shifts to the debtor to prove the petition was filed in good faith. *Frank v. Tamecki (In re Tamecki)*, 229 F.3d 205, 207 (3d Cir. 2000) (holding that "[o]nce a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith."). Dismissal should be reserved for "'those egregious cases that entail concealed or misrepresented assets and/or sources of income, lavish lifestyles, and intention to avoid a large single debt based upon conduct akin to fraud, misconduct or gross negligence.'" *Id.* (quoting *In re Zick,* 931 F.2d 1124, 1129 (6th Cir.1991)); *see also Perlin v. Hitachi Capital Am. Corp. (In re Perlin),* 497 F.3d 364, 375 (3d Cir. 2007) (holding that debtors

8

with substantial income who filed bankruptcy after creditor requested default judgment against them did not display bad faith); *In re Dahlgren*, 418 B.R. 852, 856-57 (Bankr. D.N.J. 2009) (holding that debtor filing bankruptcy on eve of sale in lieu of partition of real property, while "suspicious," was insufficient to warrant dismissal of case). To meet his burden, a debtor must show by the preponderance of the evidence that the case was filed in good faith. *Alt v. United States of America (In re Alt)*, 305 F.3d 413, 420 (6th Cir. 2002); *In re Hansen,* 473 B.R. 240, 252 (Bankr. E.D. Tenn. 2012).

Here, several undisputed facts place Debtor's good faith in question. Debtor filed her petition to halt the state court trial of Karanikas' claim. If a judgment had been entered in Karanikas' favor, he would have become Debtor's largest unsecured creditor. Debtor's plan proposes to make no payments to unsecured creditors, including Karanikas. Therefore, I find that the burden shifted to Debtor to prove that she filed her petition in good faith.

Karanikas has not alleged that all of the *Lilley* factors support a finding of bad faith. Instead, he focuses on five factors: (1) the timing of the petition; (2) the lack of a substantive reorganization purpose; (3) the nature of the debt and how it arose; (4) Debtor's treatment of creditors before and after filing the petition; and (5) Debtor's failure to be forthcoming with the Court. I will address each of these five factors to determine whether Debtor has successfully demonstrated that her case was filed in good faith.

### 1. *Timing of Debtor's petition and lack of a substantive reorganization purpose*

Five months after Karanikas filed the complaint in the Maryland Litigation, Debtor filed her bankruptcy petition. Filing a bankruptcy petition while related state court litigation is pending is not necessarily an indication of bad faith. *Myers,* 491 F.3d at 125. But the suspicious

9

Case 1:13-bk-03952-RNO    Doc 41    Filed 06/09/14    Entered 06/09/14 13:39:23    Desc
Main Document    Page 9 of 16

timing of a bankruptcy petition is an appropriate factor for consideration in a good faith analysis. *Id. (citing Tamecki,* 229 F.3d at 208). Bad faith may be found when a petition is filed to "defeat state court litigation without a reorganization purpose." *Id. (quoting In re Dami,* 172 B.R. 6, 10 (Bankr. E.D. Pa.1994)). "The filing of bankruptcy solely to thwart a creditor claim rather than making an honest effort to pay debts is bad faith." *In re Fleury*, 294 B.R. 1, 8 (Bankr. D. Mass. 2003) (*citing In re Griffith,* 203 B.R. 422 (Bankr. N.D. Ohio 1996)); *In re Moog*, 159 B.R. 357 (Bankr. S.D. Fla. 1993); *In re Brown,* 94 B.R. 576 (Bankr. D. Minn. 1988).

Debtor admits that she filed her bankruptcy to avoid defending Karanikas' claim against her in the Maryland Litigation. But the evidence does not support a finding that she did so to avoid the entry of an adverse judgment. Debtor simply could no longer afford to pay the legal fees required to defend the action. It is useful to compare the facts of this case with the facts in *Myers* in which the Third Circuit upheld the ruling of the bankruptcy court that the petition was filed in bad faith. In *Myers*, the debtor filed her petition after the state court announced its intention to rule on a creditor's fraudulent conveyance claim. At the same time, the debtor authorized her husband to withdraw funds from a business account in violation of a state court order.

Here, trial had not commenced in the Maryland Litigation so the Court cannot conclude that a judgment would have been entered against Debtor. Evidence presented by Karanikas supports his claim that the Property was damaged while Debtor was in sole and exclusive possession. Debtor failed to work with Karanikas to ensure that the roof was repaired. Also, while Debtor attempted to remedy the problems created by her cats, the damage to the marble floors demonstrate that she was unsuccessful. But other than the cut wires to the entertainment system, there is no evidence that Debtor, or the parties' children intentionally damaged the

10

Property, as alleged by Karanikas. Further, no evidence was presented that would allow the Court to conclude that if judgment had been entered in Karanikas' favor, Debtor had the ability to satisfy the judgment with her meager assets and lack of employment. While filing a petition solely to frustrate the collection efforts of a creditor suggests bad faith, it is not per se bad faith for a debtor to file for bankruptcy relief because an adverse judgment has been entered, bank accounts have been garnished, or a foreclosure sale has been scheduled. One of the purposes of bankruptcy is to enable a debtor who is unable to satisfy all her debts to reorganize her financial affairs.

Karanikas asserts that Debtor's case has no reorganization purpose. This assertion, however, is not supported by the record. Karanikas holds the largest unsecured claim and will receive nothing under the plan. But it unclear how Debtor could have paid the claims of Karanikas and other creditors while continuing to incur legal expenses related to the various controversies in which the parties are embroiled. Further, while Karanikas holds the largest unsecured claim, he is not Debtor's only creditor. Debtor has other unsecured claims, including significant legal fees incurred in several actions arising from the divorce proceeding, which also must be considered. These fees and other unsecured debt will be discharged if her plan is confirmed and she completes all payments under the plan. At the same time, through the plan she will be able pay certain priority claims to the IRS that cannot be discharged and, perhaps, will be in a better position to repay her non-dischargeable student loans. Therefore, I find that Debtor has rebutted Karanikas' allegation that she filed her petition for the sole purpose of thwarting his claim without a reorganization purpose.

11

### 2. *Nature of the debt and how it arose*

Consideration of the nature of the debt involves an examination of how the debt was incurred. *Manfredi*, 434 B.R. at 359 (citing *Myers*, 491 F.3d at 126). Karanikas' claim arose from Debtor's failure to repair a leaking roof, to care for a cat, and to attend to the aesthetics of the Property's exterior. Karanikas' chief concern, and the cause of his greatest single expenditure, appears to have been the leaking roof.[8] The leakage caused damage to drywall, moldings, plywood and carpet in one bedroom of the Property. Debtor had a duty under the Marital Agreement to maintain the Property, but both parties were responsible for repair costs of more than $1000. The Agreement is silent as to who had the responsibility for arranging for major repairs. Debtor testified, and Karanikas admitted, that Debtor informed him of the leak when she first noticed it. His response was to direct her to locate the leak and put a bucket under it in the attic until a contractor repaired the problem. But while Debtor did not contact a contractor, neither did Karanikas, even though he also was aware of the problem.

Karanikas asserts that Debtor intentionally damaged the Property, but I am not convinced that this is the case. It is clear that she failed to adequately maintain the home. She failed to correct the roof leak, but it is difficult to characterize this neglect as an intentional act intended to reduce its value. While Karanikas may have been entitled to a judgment for permissive and voluntary waste under Maryland law, Debtor's behavior is not sufficiently egregious to support a finding of bad faith. Her failure to repair the roof not only hurt Karanikas' interest in the Property, it hurt her interest as well. By failing to maintain the Property she diminished its value and, thus, she reduced the amount she received when it was sold. Unfortunately, "it is not

---

[8]Karanikas offered into evidence invoices pertaining to mold remediation, but no expert testimony was offered to support the necessity of these repairs.

12

unusual, and it is not indicative of bad faith *per se,* for a debtor's largest unsecured creditor to be an ex-spouse to whom a divorce-related debt is owed." *Liebowitz v. Hurwitz (In re Hurwitz)*, Case No. 1-03-03372, Adv. No. 1-03-00198, p. 6 (Bankr. M.D. Pa. slip op. September 30, 2004) (citing *In re Brugger,* 254 B.R. 321 (Bankr. M.D. Pa. 2000) (petition filed to avoid property settlement debt that debtor was unable to pay was not filed in bad faith). Thus, the nature of the debt in terms of how it was incurred does not require a finding of a bad faith filing in this case.

        3.     *Debtor's treatment of creditors before and after filing*

The focus of the good faith inquiry in Chapter 13 is often whether the filing is fundamentally fair to creditors and, more generally, is fundamentally fair in manner that complies with spirit of Bankruptcy Code. *Love,* 957 F.2d at 1357; *In re Gier,* 986 F.2d 1326 (10th Cir. 1993); *In re Standfield,* 152 B.R. 528 (Bankr. N.D. Ill. 1993). Karanikas argues that this factor favors dismissal of Debtor's case for three reasons: (1) she never offered to reimburse him for the cost of remediating the damage to the Property; (2) her plan proposes to pay nothing to unsecured creditors; and (3) she intends to repay the funds she "borrowed" from her parents to defend the divorce related litigation.

Neither Karanikas nor Debtor have treated each other particularly well since the filing of the divorce. Matters related to custody and property have been acrimonious and the litigation has been protracted. Debtor failed to adequately protect the Property, but the evidence does not support a finding that Debtor intentionally injured Karanikas. Further, although Debtor has unpaid federal income taxes, there is no evidence that Debtor has been unfair to her creditors generally. And while she has expressed a desire to repay her parents for funds they provided to her to defend the various legal actions related to the divorce, she has not repaid her parents to the

13

detriment of other creditors in the case. Thus, I find that Debtor's petition is fundamentally fair and does not violate the spirit of the Bankruptcy Code.

    *4.    Whether Debtor has been forthcoming with the court and creditors*

Debtor did not disclose in her schedules and statements that before she filed her petition, she borrowed $40,000 from her parents for attorneys' fees to defend the custody action involving her daughter. Karanikas is correct that if the funds were a loan that Debtor was obligated to repay, she should have disclosed this information in her schedules. The testimony regarding the terms under which Debtor received these funds are ambiguous. Debtor stated that she hoped to repay the funds to her parents once she became employed. But her commitment to repay these funds may be more aspirational than binding. Although her failure to disclose these payments is not excused, this single non-disclosure provides an insufficient basis for me to find that Debtor has not been forthcoming with the Court or with her creditors.

    *5.    Totality of the circumstances*

Having reviewed the totality of the circumstances, I find that Debtor's petition was filed in good faith. Accordingly, I conclude that Karanikas' motion to dismiss Debtor's petition should be denied.

    *B. Objection to the confirmation of Debtor's plan*

The requirements for confirmation of a Chapter 13 plan are set forth in 11 U.S.C. § 1325(a). There are nine criteria to be applied to determine whether a proposed plan should be confirmed. If all criteria are satisfied, then the plan *shall* be confirmed. 11 U.S.C. § 1325(a).

Even absent an objection, bankruptcy courts have the obligation to ensure that Chapter 13 plans comply with applicable provisions of the Bankruptcy Code. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 277 (2010). Good faith in the filing of the plan is one of the explicit

14

requisites for confirmation listed at § 1325(a)(3). ( "[T]he court shall confirm a plan if . . . the plan has been proposed in good faith and not by any means forbidden by law.") "[T]he policy behind "good faith" is the same whether raised in an objection to confirmation of a chapter 13 plan or in a motion to dismiss the case, *In re Griffith,* 203 B.R. 422, 424 (Bankr. N.D. Ohio 1996), and the factors to be considered are essentially identical. *In re Huerta,* 137 B.R. 356, 367 (Bankr. C.D. Cal.1992)." *In re Denis*, No. 10-16784-B-13, 2010 WL 9489202, 5 (Bankr. E.D. Cal. November 1, 2010). Accordingly, if the *Lilley* factors were used to analyze the good faith of the proposed plan, I would undertake a similar analysis when considering whether Debtor's plan is fundamentally fair to her creditors. I am unable, however, to undertake this analysis at this time as Debtor has admitted that the proposed plan cannot be confirmed because there is an internal inconsistency in the proposed length of the plan. At the hearing on this matter, Debtor represented that she intends to file an amended plan to address this issue after the motion to dismiss is resolved. Therefore, it is not necessary for me to determine whether the plan before me was filed in good faith, and I decline to rule on the objection to the plan. After the amended plan is filed, Karanikas will have an opportunity to object to the amended plan.

### III. Conclusion

For all of the reasons stated above, after applying the *Lilley* factors to the facts of this case, I conclude that Debtor's petition was filed in good faith. I do not address, however, whether the plan filed on July 31, 2013 was filed in good faith. An appropriate order follows.

**By the Court,**

*Mary D. France*
Chief Bankruptcy Judge

Date: June 9, 2014

.